Richard FRISENDA, Plaintiff,

v.

The INCORPORATED VILLAGE OF MALVERNE, Patricia Ann Norris–McDonald, Individually and In Her Official Capacity; James J. Callahan, III, Individually and In His Official Capacity; Joseph J. Hennessy, Individually and In His Official Capacity; John Aresta, Individually and In His Official Capacity; and James Frankie, Individually and In His Official Capacity, County of Suffolk, Richard Dormer, Henry Mulligan, Thomas Palmieri, and Michael Murphy, In Their Individual and Official Capacities, Defendants.

No. 08–CV–4198 (JFB)(ARL).

United States District Court, E.D. New York.

March 31, 2011.

Steven A. Morelli, Esq., The Law Offices of Steven A. Morelli, P.C., Garden City, NY, Anthony Christopher Giordano, Esq., Law Office of Anthony C. Giordano, P.C., Oceanside, NY, for Plaintiff.

Brian S. Sokoloff, Esq., Adam I. Kleinberg, Esq., Anthony F. Cardoso, Esq., of Sokoloff Stern LLP, Westbury, NY, for Defendants.

## MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

On October 15, 2008, plaintiff Richard Frisenda ("plaintiff" or "Frisenda") brought this action against defendants The Incorporated Village of Malverne ("the Village"), Patricia Ann Norris–McDonald ("McDonald"), James J. Callahan, III ("Callahan"), Joseph J. Hennessy ("Hennessy"), John Aresta ("Aresta"), and James Frankie ("Frankie"), individually and in their official capacities as employees of the Village (collectively, the "individual defendants"), alleging that defendants violated plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 ("Section 1983") and 1985, as well as under Section 209–a of the New York State Civil Service Law and Section 201–d(2)(d) of the New York Labor Law.[1]

Plaintiff was a Lieutenant in the Malverne Police Department and was employed by the Department for over twenty-seven years. Plaintiff asserts that the disciplinary charge that was brought against him in March 2008 (to which he pled guilty as part of a negotiated plea agreement)—namely, donating blood in the Village of Rockville Centre while on duty on October 31, 2006—was in retaliation for his First Amendment activities. Specifically, plaintiff contends that, in the winter of 2007–2008, the defendants threatened to bring numerous disciplinary charges against

---

1. By Stipulation and Order, dated February 5, 2010, plaintiff discontinued the lawsuit as to defendant James Frankie.

him, initiated a disciplinary proceeding, and constructively discharged him by forcing him to resign, all in retaliation for certain First Amendment activity—namely, (1) his membership and participation in the Malverne Police Benevolent Association, including certain union-related activities in November 2007; (2) his involvement as a witness in a federal lawsuit filed by another Malverne police officer alleging retaliation, including testifying at the officer's trial in March 2008; and (3) a December 2007 memo written by plaintiff to the Village Board and Chief of Police regarding what plaintiff believed was a failure by members of the Malverne Police Department to follow procedure in responding to a particular emergency situation.

On April 27, 2010, defendants moved for summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure on various grounds.[2] For the reasons set forth below, defendants' motion is denied with respect to plaintiff's Section 1983 claim for retaliation in violation of his First Amendment rights. Similarly, the motion is denied as to the state law claims. However, the motion is granted as to the plaintiff's Section 1983 claim under the Equal Protection Clause.

## I. Facts

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2005).

Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[3]

In 1981, the Village hired plaintiff as a probationary police officer for the Malverne Police Department ("MPD") and, after three months, was hired to be a permanent MPD police officer. (Defs.' 56.1 ¶¶ 5–6.) Plaintiff was promoted to Lieutenant in 1993. (Defs.' 56.1 ¶ 7.) The Chief of Police is the highest-ranking member of the MPD, followed by Lieutenant, then Sergeant, and then police officer. (Defs.' 56.1 ¶¶ 9–10.) Between 2006 and 2008, there were approximately 20–22 members of the MPD, which included anywhere from 3–5 Sergeants and 15–16 police officers. (Defs.' 56.1 ¶¶ 8, 11.)

As a Lieutenant, plaintiff was directly responsible for the daily oversight of approximately 2–5 police officers. (Defs.' 56.1 ¶ 12.) Plaintiff typically worked the day shift. (Defs. 56.1 ¶ 13.) In April 2008, plaintiff resigned from the MPD. (Defs.' 56.1 ¶ 14.)

Plaintiff was a member of the Malverne Police Benevolent Association ("PBA") during his entire period of employment with the MPD. (Defs.' 56.1 ¶ 29.) The members of the MPD were also members of the PBA. (Defs.' 56.1 ¶ 30.) The PBA is responsible for negotiating a collective bargaining agreement ("CBA") with the Village on behalf of the MPD Lieutenants, Sergeants and police officers, and also attempts to ensure that the CBA is complied with by the Village. (Defs.' 56.1 ¶¶ 31, 33.) The PBA holds monthly membership meetings, which have rarely been attended

---

**2.** In his opposition papers, plaintiff made clear that he was withdrawing the conspiracy claim under Section 1985.

**3.** In addition, although the parties' Rule 56.1 statements contain specific citations to the

record to support their statements, the Court has cited to the Rule 56.1 statements, rather than the underlying citation to the record, when utilizing the 56.1 statements for purposes of this summary of facts.

by the MPD's Chief of Police, and the Chief of Police negotiates his own employment contract with the Village. (Defs.' 56.1 ¶ 34.)

The PBA has four elected officer positions: President, Vice President, Secretary, and Treasurer, each of whom serve two-year terms of office. (Defs.' 56.1 ¶¶ 35–36.) Plaintiff served as PBA Treasurer from approximately 1984 to 1986, and as PBA Vice President for a single two-year term beginning in approximately 1986. (Defs.' 56.1 ¶¶ 37–38.) Plaintiff ran for PBA President in 1989, but lost. (Defs.' 56.1 ¶ 39.)

The PBA Contract Committee consists of the PBA President and 2–3 other individuals appointed by the President. (Defs.' 56.1 ¶ 41.) Plaintiff served on the PBA Contract Committee in approximately 1988 or 1989, and again beginning in October 2007 when he was appointed by PBA President John Cantanno. (Defs.' 56.1 ¶¶ 42, 50.) At the time of plaintiff's appointment in October 2007, Cantanno had been the PBA President for 4–5 years, and plaintiff served on the Contract Committee with Police Officers Thomas Martini and Thomas Winters. (Defs.' 56.1 ¶¶ 51–52.) Plaintiff served on this committee until his resignation in April 2008. (Defs.' 56.1 ¶ 53.) Plaintiff's first involvement in the 2007 CBA negotiations occurred in or about November 2007, when plaintiff attended a contract negotiation session with the Village. (Defs.' 56.1 ¶ 57.) The parties had not reached a new CBA by the time of plaintiff's resignation in April 2008. (Defs.' 56.1 ¶ 69.)

Plaintiff asserts that the reassignment of his loyalty from management to personnel came as a surprise to the Village Defendants. (Frisenda Decl. ¶ 15.) Specifically, plaintiff contends that, in front of other members of the PBA Contract Committee during the November 2007 negotiating meeting, Village Attorney James Frankie looked at plaintiff and said in an angry tone, "What is he doing here?" and Frankie was advised that plaintiff had been added to the committee. (Defs.' 56.1 ¶¶ 58, 61.) According to Frankie, his comment at this daytime meeting was prompted by his concern that as to who was manning the front desk at the police station, since plaintiff typically worked as the daytime desk officer and was wearing his police uniform. (Defs.' 56.1 ¶¶ 65–66.) Plaintiff asserts that Frankie, even after being advised that plaintiff was part of the Contract Committee, continued to display mannerisms indicating that he was angry with plaintiff's participation. (Pl.'s 56.1 ¶ 68.). Plaintiff further asserts that, on or about November 16, 2007, the Village received opposition to its motion for summary judgment in the lawsuit of *Donovan v. The Incorporated Village of Malverne*, No. 05–cv–3726, which included a declaration from PBA President Cantanno in which he stated that the Village had been threatening the PBA with respect to an issue that came up during the contract negotiations should the PBA members not unite with the trustees for the purpose of convincing Donovan to drop his lawsuit. (Pl.'s 56.1 ¶ 57.)

In the months prior to the November 2007 negotiating session between the Village and the PBA, plaintiff was part of a group of the high-ranking MPD officers who were exploring the possibility of breaking off from the PBA and forming their own collective bargaining unit—called the Malverne Superior Officers Association (the "SOA"). (Defs.' 56.1 ¶¶ 70–71.) The SOA was to consist solely of the Lieutenants and Sergeants of the MPD. (Defs.' 56.1 ¶ 72.) Plaintiff and the other superior officers were in favor of creating this new bargaining unit, but first needed to see how contract issues with the Village would play out. (Defs.' 56.1 ¶ 73.) According to plaintiff, all potential members

of the SOA kept their efforts hidden from the PBA. (Frisenda Decl. ¶ 14.) With regard to the proposed SOA, plaintiff and Sergeant Kid met with Chief Aresta and Trustee James J. Callahan III. (Defs.' 56.1 ¶ 76.) According to plaintiff, Callahan indicated that the Village Board wanted to see the SOA get formed, but plaintiff would not proceed any further without having a CBA for the SOA to sign. (Defs.' 56.1 ¶ 77.) A proposed CBA was circulated for the SOA, but plaintiff believed there were too many sticking points that could not be resolved. (Defs.' 56.1 ¶ 78.) Plaintiff further asserts that the SOA would have left the PBA with less negotiating power, lower membership, and less individuals at the top. (Pl.'s 56.1 ¶ 76.) Plaintiff also contends that Chief Aresta told him that, if he could convince the other potential members to create the SOA, then the Village would create a new post (Deputy Inspector) for plaintiff, which would make plaintiff in second command of the MPD, involve more pay, and provide a more flexible schedule. (Pl.'s 56.1 ¶ 78.) According to plaintiff, he put an end to the SOA idea in either October or November 2007, at some point after a series of emails on October 16, 2007 between Sergeant Kid and plaintiff. (Defs.' 56.1 ¶¶ 79–80; Pl.'s 56.1 ¶¶ 79–80.) In around the end of October or early November 2007, the proposed SOA members held a meeting and voted 5–1 against forming the SOA—with plaintiff, Sergeant Clements, Sergeant Engel, Sergeant Oddo, and Sergeant Moss voting against the formation of the SOA, and Sergeant Kid voting in favor of the formation of the SOA. (Defs.' 56.1 ¶¶ 81–82; Pl.'s 56.1 ¶ 81.). According to plaintiff, although he did not notify the Village Board of the vote, he notified Chief Aresta, who was not happy about the vote and told plaintiff he was making a big mistake. (Pl.'s 56.1 ¶ 83.) Immediately prior to the vote, plaintiff also told PBA President Cantanno about the proposed SOA and

Cantanno was angry about the situation. (Defs.' 56.1 ¶¶ 84–85.)

Article 14.0 of the CBA between the Village and the PBA, entitled "Special Days," reads: "In the event that a 'special day' or holiday or day for special observance is declared by the President of the United States, the Governor of the State of New York or the Nassau County executive, a member who is on duty on that day shall be entitled to receive a compensatory time for such duty." (Defs.' 56.1 ¶ 86.) On December 7, 2007, Chief Aresta sent an email to all MPD members regarding the Department's usage of "Special Days"— also referred to as "Green Days"—which stated: "It has come to my attention that members of this department have been receiving time in their 'time returned' bank under the name 'Special Days' or 'Green Days'. Be advised that none of this time credited to individual's records is authorized or valid. I have ordered Sergeant Stan Kid to expunge from each members records, that time which was incorrectly added." (Defs.' 56.1 ¶ 88.) Thus, Chief Aresta proceeded to take away the Special Days that had been credited to all MPD members. (Defs.' 56.1 ¶ 89.)

According to Trustee Callahan, the Village Board had long been concerned with the high amount of overtime being paid in the MPD. (Defs.' 56.1 ¶ 9 1.) According to Chief Aresta, he first learned about the abuse of Special Days after finding a slip of paper on his copy machine that contained dates and names. (Defs.' 56.1 ¶ 92.) Chief Aresta contends that he asked Sergeant Kid about the contents of the paper and Sergeant Kid, who was responsible for inputting time records in the MPD, told him that the slip of paper contained a list of Special Days for which the MPD officers were receiving credit, including days such as Haym Solomon Day, Child Health Day, and Harriet Tubman Day. (Defs.' 56.1

¶¶ 93–95.) According to defendants, PBA President Cantanno had given a list of Special Days to Sergeant Kid for input into the MPD attendance records. (Defs.' 56.1 ¶ 96.) Defendants also assert that neither Chief Aresta nor the Board authorized these specific Special Days. (Defs.' 56.1 ¶ 97.) Chief Aresta advised the Village Board in November or December 2007 that the Department's use of "Special Days" had been a cause of the increase in overtime payments. (Defs.' 56.1 ¶ 98.)

Plaintiff disputes the timing of Chief Aresta's knowledge regarding this practice and asserts that Chief Aresta had specific knowledge of the "Special Days" prior to December 2007 because Chief Aresta requested a cash, payroll reimbursement for the date of March 10, 2006, which was "Harriet Tubman Day," and is contrary to the CBA because the CBA only allows time to be credited to a member's time bank for use at a later date. (Pl.'s 56.1 ¶ 92.) Plaintiff also asserts that timekeeping oversight is, at all times, the responsibility of the timekeeper, who was Sergeant Kid, and Chief Aresta. (Pl.'s 56.1 ¶ 12.)

By Board resolution of December 17, 2007, the Board commissioned an investigation into the MPD's use of Special Days. (Defs.' 56.1 ¶ 99.) The Village hired Thomas Nerney to perform the Special Days investigation. (Defs.' 56.1 ¶ 100.) At the time, Village Mayor McDonald had known Nerney for approximately 30 years. (Defs.' 56.1 ¶ 101.) Nerney retired from the New York Police Department ("NYPD") after 36 years of service, 28 of which he worked as an NYPD detective, including in the NYPD's Major Case Squad. (Defs.' 56.1 ¶¶ 102–03.) Nerney had previously assisted the Village in rewriting portions of the MPD's patrol guide. (Defs.' 56.1 ¶ 104.) According to the defendants, Nerney interviewed all members of the MPD in January and February 2008. (Defs.' 56.1 ¶¶ 105–06.) Defendants further assert that, at the request of the Village Board, Village Attorney Frankie assisted Nerney, schedule permitting, with the initial part of the investigation and attended some of the interviews. (Defs.' 56.1 ¶ 107.)

Plaintiff disputes the respective roles of Frankie and Nerney in the investigation. For example, plaintiff asserts that Frankie conducted and largely led the interviews for Sergeant Kid and plaintiff, and also participated in the interview of Police Officer John Cantanno. (Pl.'s 56.1 ¶ 105.) Plaintiff also disputes the timing of the interviews. Specifically, plaintiff contends that the interviews of the MPD members were conducted from December 2007— with Sergeant Kid being interviewed on December 21, 2007, and Police Officers Robert Lang and Vincent Esposito (PBA Vice President) being interviewed on December 27, 2007. (Pl.'s 56.1 ¶ 106.)

On January 4, 2008, Nerney interviewed plaintiff, with plaintiff's PBA attorney, another PBA representative, and Village Attorney Frankie. (Defs.' 56.1 ¶¶ 108–09.) Plaintiff concedes that he was not the only member of the MPD interviewed as part of the Special Days investigation. (Pl.'s 56.1 ¶ 110.) Plaintiff, however, contends that each member of the MPD was interviewed as a pretext to constructively terminating plaintiff. In particular, plaintiff asserts that, even after the investigators were presented with proof that Chief Aresta and Sergeant Kid were the individuals with authority over the use of Special Days and that Chief Aresta falsely stated that he had no knowledge of the use of Special Days, defendants continued to focus their investigation on plaintiff and Police Officer Cantanno. (Frisenda Decl. ¶ 31; Latham Decl. ¶¶ 14–15.) As an example, plaintiff notes that, when he attempted to demon-

strate that Chief Aresta had knowledge of the "Special Days" issue prior to December 2007, Village Attorney Frankie responded by asking, "Ok, and this helps in my investigation how?" (Latham Decl. ¶ 15.) Plaintiff further notes that he was then reminded to turn over documents which related to his schedule (i.e., memo book) and the use of Blood Days, discussed infra. (Latham Decl. ¶ 15.) Plaintiff asserts that he was treated differently during the interviews because: (1) out of the 21 interviews, plaintiff was one of a few MPD members required to take an oath, and (2) plaintiff was the only member instructed during the interview by the Village Attorney to produce his memo book as part of the investigation. (Latham Decl. ¶¶ 12, 16.)

Nerney prepared a report, dated March 12, 2008, summarizing his findings in the Special Days investigation. (Defs.' 56.1 ¶ 113.) The Village did not charge anyone in connection with the abuse of Special Days, but rather simply took back the days that had been credited to all of the officers. (Defs.' 56.1 ¶ 115.)

Around the same time in 2007 that the Special Days issue was presented to the Village Board, the Village also directed that an investigation be conducted into the MPD members' use of Blood Days. (Defs.' 56.1 ¶ 116.) In particular, on December 17, 2007, the Village Board directed Chief Aresta to determine whether any MPD members had been improperly using Blood Days. (Defs.' 56.1 ¶ 117.) Blood Days refer to the practice where Department members received 12 hours of compensatory time for donating blood. (Defs.' 56.1 ¶ 118.) The Village Board also asked Village Attorney Frankie to investigate issues such as whether anyone in the MPD was donating blood on department time, whether it was being done outside the Village, and whether it was sanctioned. (Defs.' 56.1 ¶ 119.) On December 18, 2007, Chief Aresta sent an e-mail to all members of the MPD regarding blood donations, which stated: "The Board of Trustee has recently learned that members of this Department have been receiving time returned for blood donations. As time returned is not available for blood donations, effective immediately all time returned that a member has received since January 1, 2002 will be removed from each member's time records." (Defs.' 56.1 ¶¶ 120–21.) While the CBA did not authorize Blood Days, plaintiff believes it was a practice that had been going on in the department for some time. (Defs.' 56.1 ¶ 122.) Plaintiff understood a Blood Day as, "[i]f we donate blood, we receive 12 hours credit for it on the books for the blood donation." (Defs.' 56.1 ¶ 123.)

Village Attorney Frankie ("Frankie") looked at the blood donation records of all members of the MPD. (Defs.' 56.1 ¶ 124.) Plaintiff did not know if the entire MPD was investigated about their use of blood donation days, but he was aware that he and some other MPD members were being investigated. (Defs.' 56.1 ¶ 125.) Plaintiff had never seen anywhere in writing that anyone was specifically targeting him through the blood days investigation. (Defs.' 56.1 ¶ 126.) Upon review of the relevant records, Frankie learned that plaintiff and 1–2 other MPD officers had donated blood while on duty.[4] (Defs.' 56.1 ¶ 127.) With respect to the individuals other than plaintiff who were found to have donated blood on department time,

---

4. Plaintiff notes that Frankie only learned about the plaintiff donating blood while on duty because he demanded a copy of plaintiff's memo book during the investigation into the use of Special Days, but did not ask any other officer for his or her memo book, and thus could not have found out if other officers had, like plaintiff, had donated blood while on duty. (Pl.'s 56.1 ¶ 127.)

the incidents occurred years prior and the Village believed that any disciplinary charges would have been untimely. (Defs.' 56.1 ¶ 128.)

On December 30, 2007, plaintiff wrote a memorandum to Chief Aresta to detail problems that he had perceived in the MPD. (Defs.' 56.1 ¶ 160.) The items set forth in plaintiff's December 30, 2007 Memorandum were things he came to learn as part of his duties and responsibilities in the MPD. (Defs.' 56.1 ¶ 161.) It was part of plaintiff's job duties to take corrective or disciplinary action towards subordinates who committed improper conduct. (Defs.' 56.1 ¶ 162.) Plaintiff's December 30, 2007 Memorandum details that he spoke to the officers involved in the incident described in plaintiff's Memorandum and recommended that the Village have one of the officers retrained. (Defs.' 56.1 ¶ 163.) Plaintiff also wrote that he felt the enactment of a Procedure Manual was warranted and that communication was lacking in the police department as Chief Aresta ("Aresta") had not called an officer's meeting in two years. (Defs.' 56.1 ¶ 164.)

On January 4, 2008, Frankie questioned plaintiff regarding his use of blood donation days and plaintiff admitted leaving the Village while on duty to go donate blood. (Defs.' 56.1 ¶¶ 129, 131.) On multiple occasions, plaintiff would take a police vehicle and leave the Village of Malverne while on duty in order to donate blood, sometimes going to the neighboring Incorporated Village of Rockville Centre. (Defs.' 56.1 ¶ 132.) Rockville Centre is located a couple of miles from the Village and requires passing through the Incorporated Village of Lynbrook. (Defs.' 56.1 ¶ 135.) Although plaintiff asserts that Rockville Centre from Malverne is mere minutes away,

defendants dispute that and point to evidence that it can take 10–15 minutes to get there because of traffic.[5] (Defs.' 56.1 ¶ 136; Pl.'s 56.1 ¶ 132.) Village Attorney Frankie gave an oral report to the Board as to his findings. (Pl.'s 56.1 ¶ 139.)

Although defendants assert that the investigation revealed that plaintiff had violated Department regulations and had been abusing the blood donation day practice, plaintiff disputes that his conduct was against regulations or was an abuse. (Defs.' 56.1 ¶ 130; Pl.'s 56.1 ¶ 130.) In particular, plaintiff points to the following evidence to dispute this contention: (1) Village Attorney Frankie stated that to his knowledge there are no regulations that require members of the MPD to stay within the Village during lunch breaks; (2) plaintiff stated under oath that, while in service in the MPD since 1981, it has been the regular practice for members of the MPD to leave the Village of Malverne while on duty, in police vehicles, during their break, and no other officer was disciplined for that kind of use of department vehicles and at one point it was even encouraged by a former Chief of Police; (3) when combined, the authorized break period for a member of the MPD during one shift, can equal one hour and forty-five minutes; (4) Police Officer Donovan testified that, if a member of the MPD was on break, then he or she was permitted to leave the confines of the Village in order to donate blood; (5) during Police Officer John Cantanno's interview, during the Special Day/Blood Day investigation, he told Mr. Frankie and Mr. Nerney that he was once told, by desk officer Sergeant Stanley Kid, that he had left early to donate blood; (6) according to plaintiff, defendants did not investigate Sergeant Kid's

---

**5.** There is evidence in the record that the distance was about three miles. (Callahan Dep. at 31.)

blood donation, and he was promoted to Lieutenant less than one month after plaintiff resigned; (7) defendant Aresta could not recall if Sergeant Kid was investigated for having donated blood twice in less than 56 days, despite that blood can only be donated once every 56 days; (8) John Donovan was also credited for two blood days within a 56-day period, but was not investigated for having done so; (9) the Village of Malverne hires its graduates from the Basic Police Training Course, administered by the Nassau County Police Department, and (according to plaintiff) the accepted practice of the Academy is to allow recruits to donate blood while on duty and this practice was made known to the Village Board during the Blood Days investigation; and (10) the Village Board, by statute or by means of the CBA, did not expressly prohibit officers from donating blood while on duty. (Pl.'s 56.1 ¶¶ 130–131, 133.)

According to the Village, it was concerned that plaintiff had left the confines of the Village while on duty, using a Village vehicle, and going to donate blood, which would result in him being less than 100% fit to respond to a call (while carrying a gun) and potentially even unavailable in the event of an emergency situation. (Defs.' 56.1 ¶ 137.) The Mayor also believed that, as a supervisor, plaintiff was expected to uphold department regulations. (Defs.' 56.1 ¶ 138.) Again, plaintiff disputes that these were the real concerns of the Village and the Mayor, but rather asserts that it was retaliatory because of his First Amendment activities. On the issue of being able to perform his duties while donating blood, plaintiff asserts that he was no less fit to perform his duties as Lieutenant after donating blood because his duties were primarily administrative in nature, and typically required him to stay in the station house, at a desk, receiving incoming calls and dispatching cars. (Pl.'s 56.1 ¶ 137.) Plaintiff also asserts that at least one other officer donated blood prior to coming on duty, which raises the same concerns about fitness to perform duties, and another officer testified that they sometimes have blood drives at the MPD. (Pl.'s 56.1 ¶ 137.)

On March 7, 2008, plaintiff testified at the trial in *Donovan v. The Incorporated Village of Malverne*, No. 05–cv–3726. (Defs.' 56.1 ¶ 183.) MPD Police Officer John Donovan had brought that lawsuit in August 2005, alleging that the Village did not promote him because of his membership in the PBA. (Defs.' 56.1 ¶ 172.) Plaintiff does not recall if Donovan was a member of the PBA Board or on the contract committee. (Defs.' 56.1 ¶ 173.) Plaintiff offered to testify on behalf of Donovan in the lawsuit and, in November 2006, plaintiff was deposed in that case. (Defs.' 56.1 ¶¶ 174–75.) Plaintiff believes that he did not get promoted to Chief in 2006 because of his deposition testimony. (Defs.' 56.1 ¶ 176.) No Board members told plaintiff that they were unhappy that he was testifying and assisting Donovan in his lawsuit, but plaintiff claims that Chief Aresta mentioned the Donovan lawsuit to him a couple of times. (Defs.' 56.1 ¶¶ 177–78.) According to plaintiff, in October or November 2007, plaintiff told Aresta, "I'm aware that Donovan's case is coming up and they're not happy about that." (Defs.' 56.1 ¶ 179.) According to plaintiff, Aresta responded, "[t]hat's your choice," which plaintiff understood as a choice between participating in the *Donovan* lawsuit thereby facing retaliation from the Village Board, or removing himself from that lawsuit to gain favor with the Village Board. (Defs.' 56.1 ¶ 180; Pl.'s 56.1 ¶ 180.) Plaintiff further claims that, in or about 2006, Aresta (then a Lieutenant) and plaintiff (also a Lieutenant) discussed who would take over running the police department after Chief Jacobsen had been fired. (Defs.' 56.1 ¶ 181.) According to plaintiff, Aresta discussed

that plaintiff was a witness in the Donovan case, and plaintiff felt it was obvious the Board had no interest in having plaintiff take over the department. (Pl.'s 56.1 ¶ 182.) Other than the deposition and trial testimony, plaintiff played no role in the *Donovan* lawsuit. (Defs.' 56.1 ¶ 184.)

Defendants point out that plaintiff was not demoted after participating in the *Donovan* lawsuit, and did not lose salary or get assigned different job responsibilities or duties after participating in that lawsuit. (Defs.' 56.1 ¶¶ 185–86.) However, plaintiff claims that he was not considered for a promotion because of his participation in the *Donovan* lawsuit. (Pl.'s 56.1 ¶ 185.) Moreover, plaintiff asserts that defendants continued to harass him immediately after his testimony in the *Donovan* trial on March 7, 2008. (Pl.'s 56.1 ¶ 187.) In particular, plaintiff asserts that, on March 11, 2008, the jury in the *Donovan* lawsuit returned a verdict in favor of the Village and, on March 13, 2008, defendant McDonald met with defendants Aresta and Frankie in the MPD for the purpose of discussing disciplinary action to be taken against plaintiff. (Pl.'s 56.1 ¶ 187.) According to plaintiff, when he appeared for questioning on March 14, 2008, as ordered, defendants Frankie and Aresta harassed plaintiff by asking him questions about various days on which he donated blood, why these activities did not appear in plaintiff's memo book, and generally questioning the veracity of plaintiff's whereabouts on those particular days. (Pl.'s 56.1 ¶ 187.)

Plaintiff submitted a letter of resignation dated March 19, 2008.[6] (Defs.' 56.1 ¶ 140.) Plaintiff consulted with his attorney before resigning in March 2008 and his attorney told him that disciplinary charges would be forthcoming. (Defs.' 56.1 ¶¶ 141–42.) The Village Attorney advised the Board that there were multiple charges that the Village could bring against plaintiff and wanted to discuss a plea bargain. (Defs.' 56.1 ¶ 143.) In particular, the Village Attorney believed that the Village could have charged plaintiff with numerous charges for things such as giving blood on Village time, leaving the police department understaffed, and participating in a Village running race while on duty. (Defs.' 56.1 ¶ 144.) Plaintiff negotiated a written, signed plea agreement with the Village whereby he agreed to plead guilty to a single disciplinary charge and forfeited ten vacation days. The Village felt that since plaintiff was retiring, the plea agreement only needed to contain a single charge. (Defs.' 56.1 ¶ 145.) The sole disciplinary charge accused plaintiff of Violating Article 6, Section 8(5) of the MPD's Rules and Regulations, as follows: "[Plaintiff], on or about October 31, 2006 at approximately 1600 hours while on scheduled duty for the Malverne Police Department left the confines of the Village of Malverne without permission, authority or police necessity." (Defs.' 56.1 ¶ 147.) Be-

---

**6.** Plaintiff's March 2008 resignation was not his first letter of resignation in the MPD. (Defs.' 56.1 ¶ 151.) By letter dated December 24, 2007, during the period when the Special Days issue came to the forefront, plaintiff resigned from the MPD effective January 25, 2008. (Defs.' 56.1 ¶¶ 153–54.) Plaintiff was not planning to resign from the MPD prior to December 2007, but claims he submitted the resignation letter in December because he was disgusted with the Village Board and believed Chief Aresta would go to any measure to tarnish his record. (Defs.' 56.1 ¶¶ 155–56.) Plaintiff further claims that he and Officer Cantanno were being blamed for Special Days and Blood Days issues. (Defs.' 56.1 ¶ 156.) By letter dated December 26, 2007, plaintiff rescinded his resignation after speaking with counsel. (Defs.' 56.1 ¶ 157.) Plaintiff had not spoken with the Village Board, the Village Attorney or Chief Aresta between the time of his resignation and the rescission. (Defs.' 56.1 ¶ 158.) The Village accepted the rescission without issue. (Defs.' 56.1 ¶ 159.)

fore signing the negotiated plea agreement, plaintiff understood that he was waiving his right to a disciplinary hearing and to confront and present witnesses.[7] (Defs.' 56.1 ¶ 148.)

Plaintiff asserts that he submitted his resignation because the Village was attempting to force his resignation by bringing disciplinary charges against him and placing him in fear of losing his pension if found guilty of the disciplinary charges. (Pl.'s 56.1 ¶ 140.) Plaintiff also disputes the implication that he was guilty of any of the proposed charges that the Village Attorney threatened to bring because, as discussed above, plaintiff asserts that the MPD often encouraged police officers to engage in these activities and held blood drives at the MPD building itself. (Pl.'s 56.1 ¶ 144.) Plaintiff further contends that he waived his right to a disciplinary hearing because he was being constructively discharged, and did not believe he would get a "fair shake" from the Village Board if he fought the charge. (Pl.'s 56.1 ¶¶ 148–49.) In addition, as noted above, plaintiff asserts other officers were disciplined differently by the Village Board, including two officers who (according to plaintiff) let a prisoner escape from custody and were never disciplined in any way. (Pl.'s 56.1 ¶ 149.)

The PBA filed a grievance over the Special Days issue. (Defs.' 56.1 ¶ 165.) In November 2008, approximately six months after plaintiff's resignation, the arbitrator found in the Village's favor on the Special Days grievance. (Defs.' 56.1 ¶ 166.) The arbitrator found that Cantanno improperly told Sergeant Kid to modify Village records to support his view that the days at issue qualified as Special Days. (Defs.' 56.1 ¶ 167.) Cantanno was not disciplined for his role in the Special Days investigation.[8] (Defs.' 56.1 ¶ 168.) The PBA also filed a grievance on the Blood Days issue. (Defs.' 56.1 ¶ 169.) The PBA won the grievance in November 2008, as the arbitrator found that the Blood Days were not authorized in the CBA, but that the Village's practice of time returned constituted a "past practice" that could not be summarily taken away. (Defs.' 56.1 ¶ 170.) There is no finding in the arbitration decision as to whether or not plaintiff had abused the Blood Days as alleged. (Defs.' 56.1 ¶ 171.)

## II. PROCEDURAL HISTORY

Frisenda filed the complaint in this action on October 15, 2008. Defendants answered the complaint on January 6, 2009. On April 27, 2010, defendants submitted their motion for summary judgment. Plaintiff submitted his opposition on July 30, 2010. Defendants submitted their reply on August 12, 2010. The Court held oral argument on September 9, 2010. On September 14, 2010, counsel for defendants submitted a letter to address an issue raised at oral argument. The Court has fully considered the submissions of the parties.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may

---

7. Trustee Callahan, an attorney, acknowledges that it crossed his mind that the plaintiff's 2008 plea negotiation was taking place within a month of plaintiff testifying at the *Donovan* trial. (Defs.' 56.1 ¶ 187.) However, Callahan admits that he never discussed this thought with the other Board members or the Village attorney. (Defs.' 56.1 ¶ 188.) Mayor McDonald, a non-attorney, denied having such a concern about timing. (Defs.' 56.1

¶ 189.) Callahan's concern was assuaged by getting the resignation and plea negotiation in writing. (Defs.' 56.1 ¶ 190.)

8. Plaintiff notes that Sergeant Kid was promoted shortly after the investigation even though he failed to confirm with Chief Aresta whether the Special Days were approved. (Pl.'s 56.1 ¶ 168.)

not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.2006). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir.2004). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir.2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or

is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996).

## IV. DISCUSSION

■■■ As stated *supra*, plaintiff brings his First Amendment retaliation and equal protection claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).[9] For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dy-*

---

9. Specifically, Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

*lag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Here, for purposes of this motion, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Frisenda of the rights he asserts under the First Amendment and under the Equal Protection Clause.

### A. First Amendment Retaliation Claim

Plaintiff claims that he was retaliated against for three types of First Amendment activity: (1) his membership and participation in the Malverne Police Benevolent Association; (2) his involvement as a witness in a federal lawsuit filed by another Malverne police officer alleging retaliation; and (3) a December 2007 memo written by plaintiff to the Village Board and Chief of Police regarding what plaintiff believed was a failure by members of the Malverne Police Department to follow procedure in responding to a particular emergency situation.

■■■ The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh,* 535 F.3d 71, 76 (2d Cir.2008). Where, as here, a public employee brings a retaliation claim based on the First Amendment, a plaintiff must put forth evidence that demonstrates the following in order to establish a *prima facie* case: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[ ] on a matter of public concern; (2)[he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment de-

cision." *Skehan v. Vill. of Mamaroneck,* 465 F.3d 96, 106 (2d Cir.2006), *overruled on other grounds by Appel v. Spiridon,* 531 F.3d 138, 140 (2d Cir.2008). However, defendants may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.* The latter is known as the "Pickering balancing test" and is a question of law for the Court. *See Cobb v. Pozzi,* 363 F.3d 89, 101–02 (2d Cir.2004) (referring to *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Even if the government prevails on the *Pickering* test, plaintiff may still succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption. *See Reuland v. Hynes,* 460 F.3d 409, 415 (2d Cir. 2006).

Defendants contend that plaintiff's First Amendment retaliation claim cannot survive summary judgment on several grounds: (1) plaintiff's December 30, 2007 memo was not protected speech;[10] (2) plaintiff did not suffer an adverse employment action; and (3) plaintiff has not established that his speech was a substantial or motivating factor in any adverse employment action. (Defs.' Mem. of Law at 3–12.) Defendants further argue that, even if plaintiff is able to sustain a *prima facie* claim, his claim cannot survive summary judgment because defendants have shown that defendants would have taken

---

**10.** In its motion for summary judgment, the defendants did not address whether plaintiff's union activities or his involvement in the Donovan federal lawsuit constitute protected speech that can form the basis for a retaliation claim. Furthermore, despite plaintiff's opposition, in which he set forth his argument supported by the relevant case authority with respect to these issues, the defendants did not respond in their reply. In any event, as discussed *infra,* any such contention by defendants would be without merit.

the same action regardless of the allegedly protected conduct. (Defs.' Mem. of Law at 13–15.) After careful consideration of the record under the applicable summary judgment standard, the Court finds that summary judgment on the First Amendment retaliation claim is unwarranted.

### 1. The Protected Speech Issue

Defendants argue that the December 30, 2007 memorandum written to the MPD Police Chief Aresta, in which he pointed out certain MPD procedures that he believed created dangerous circumstances, cannot as a matter of law constitute protected speech for purposes of a First Amendment retaliation claim. In particular, defendants argue that the memo involved unprotected speech as a public employee, pursuant to his official duties, rather than protected speech as a private citizen. As set forth below, the Court agrees. However, plaintiff has set forth evidence of two other types of conduct in which he engaged—namely, participating in union activity and providing testimony in another employee's retaliation lawsuit—that both constitute protected speech that can form the basis for a retaliation claim. Thus, summary judgment on this ground as to those other categories of speech is unwarranted.

■ As the Second Circuit recently emphasized, "[i]t is established law in this Circuit that, '[r]egardless of the factual context, we have required a plaintiff alleg-ing retaliation to establish speech protected by the First Amendment.'" *Sousa v. Roque*, 578 F.3d 164, 169–70 (2d Cir.2009) (quoting *Williams*, 535 F.3d at 76). More specifically, "[t]o determine whether or not a plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Id.* at 170 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). It is critical to note that this test contains two separate requirements—namely, (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern. If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law. *See id.* ("If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" (quoting *Garcetti*, 547 U.S. at 418, 126 S.Ct. 1951)).[11]

■ In *Garcetti v. Ceballos*, the United States Supreme Court clarified the threshold inquiry for a First Amendment retaliation claim in the public employment context. To determine whether the speech at issue is constitutionally protected, the court must first decide whether the plaintiff was speaking as a "citizen," rather than as a public employee. 547 U.S. at

---

**11.** In *Sousa,* the Second Circuit reiterated, on the issue of whether the speech addresses a matter of public concern, that "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." 578 F.3d at 173. Thus, the Court held that "the District Court erred in concluding that Sousa's speech did not address a matter of public concern because he was motivated by his employment grievances." *Id.* at 174. Instead, "[w]hether or not speech addresses a matter of public concern 'must be determined by the content, form, and context of a given statement, as revealed by the whole record,' and while motive surely may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* at 175 (citation omitted). However, this Court need not address the "matter of public concern" requirement in the instant case as it relates to the December 30 Memorandum because the undisputed facts demonstrate as a matter of law that plaintiff was not speaking as a citizen, but rather as an employee pursuant to his official duties, in connection with that speech.

421, 126 S.Ct. 1951. "If the answer is 'no,' then no First Amendment claim arises, and that ends the matter." *Caraccilo v. Vill. of Seneca Falls, N.Y.*, 582 F.Supp.2d 390, 405 (W.D.N.Y.2008). In *Garcetti*, the Supreme Court explained that:

[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421–22, 126 S.Ct. 1951.

By expressly holding that speech pursuant to a public employee's official duties is not insulated from employer discipline, *Garcetti* emphasized the dual nature of the threshold inquiry into the status of speech; it first directs a court's attention to the role that the speaker occupied, requiring that "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of [his] public job." *Mills v. City of Evansville*, 452 F.3d 646, 647 (7th Cir.2006); *see also Weintraub v. Bd. of Educ. of City of New York*, 489 F.Supp.2d 209, 214 (E.D.N.Y.2007) (noting that *Garcetti* made clear that, in addition to the "public concern" element, there is a "new and independent element of a claim of First Amendment retaliation—that the public employee's speech was made in the employee's capacity as a private citizen rather than as an employee, a criterion that is never satisfied when the employee speech at issue was made pursuant to the employee's official duties."); *Benvenisti v. City of New York*, No. 04 Civ. 3166(JGK), 2006 WL 2777274, at *7 (S.D.N.Y. Sept. 23, 2006) ("First, the Court must determine whether the plaintiff was speaking as a 'citizen' for First Amendment purposes. After that, the Court must turn to the traditional [*Connick v. Myers*, 461 U.S.

138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ] analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon 'matters of public concern.' " (citations omitted)).

*Garcetti*, however, did not "articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 547 U.S. at 424, 126 S.Ct. 1951. In that case, there was no dispute that the plaintiff, a deputy district attorney and calendar deputy with certain supervisory responsibilities over other lawyers, wrote the memorandum at issue, which recommended dismissal of a case based on misrepresentations found in an affidavit, pursuant to his employment duties. *Id.* at 421, 126 S.Ct. 1951; *accord Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir.2008). Although the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's officials duties, it instructed that the inquiry "is a practical one[,]" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25, 126 S.Ct. 1951. It also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do *not* work for the government." *Id.* at 423, 126 S.Ct. 1951 (emphasis added). To illustrate its point by way of comparison, *Garcetti* "also list[ed] examples of prototypical protected speech by public employees, namely 'mak[ing] a public statement, discuss[ing] politics with a coworker, writ[ing] a letter to newspapers or legislators, or otherwise speak[ing] as a

citizen.'" *Davis v. McKinney,* 518 F.3d 304, 312 (5th Cir.2008) (quoting *Spiegla v. Hull,* 481 F.3d 961, 967 (7th Cir.2007)).

 Since *Garcetti,* some lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties. Although none of the following factors are dispositive, they may be considered by the Court: "the plaintiff's job description;" the persons to whom the speech was directed; and "whether the speech resulted from special knowledge gained through the plaintiff's employment." *See Caraccilo,* 582 F.Supp.2d at 405. As indicated by *Garcetti,* two relevant factors that, considered in isolation, are not dispositive are whether the speech occurs in the workplace and whether the speech concerns the subject matter of the employee's job. *See* 547 U.S. at 420–21, 126 S.Ct. 1951; *accord Abdur–Rahman v. Walker,* 567 F.3d 1278, 1282 (11th Cir.2009). Again, in general, "[a]lthough there is no simple checklist or formula by which to determine whether the employee was speaking as a private citizen or as a public employee ... 'the cases distinguish between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job.'" *Caraccilo,* 582 F.Supp.2d at 410 (quoting *Davis,* 518 F.3d at 312–13).

### a. The December 30 Memorandum

 As set forth below, after careful consideration of the underlying undisputed facts, the Court concludes that plaintiff's speech contained in the December 30 Memorandum was made in his capacity as a Lieutenant in the MPD, not as a citizen.[12] Consequently, plaintiff's speech in the December 30 Memorandum does not fall within the ambit of First Amendment protection.

First, it is undisputed that the subject matter of plaintiff's speech in the December 30 Memorandum related to his employment. Specifically, the Memorandum sought to address plaintiff's belief that "[t]here are currently serious communications problems within the Malverne Police Department, leading to potentially dangerous situations and exposing the village to legal liability." (Kleinberg Decl., Ex. DD, at 1.) In fact, not only did the Memorandum relate to plaintiff's job, but rather it pertained to a core function—namely, communications between police officers in investigating, and responding to, calls for police assistance. Thus, the Memorandum certainly related to his employment.

Second, there is no question that plaintiff's speech, in the form of this Memorandum, was only made internally within the MPD. The Memorandum was addressed to Chief John Aresta, and was "cc'd" to the Board of Police Commissioners. There is

---

**12.** To the extent that it is unclear whether this issue is a question of law for the Court or a mixed question of law and fact in part for a factfinder, that uncertainty does not impact the analysis herein. *Compare, e.g., Caraccilo,* 582 F.Supp.2d at 412 (stating that the issue is ultimately a matter of law but that underlying factual issues preclude summary judgment) *with Mulcahey v. Mulrenan,* No. 06 Civ. 4371(LBS), 2008 WL 110949, at *4 (S.D.N.Y. Jan. 3, 2008) (following the guidance in *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684, that "the inquiry into the protected status of speech is one of law, not fact"); *see generally Posey,* 546 F.3d at 1127–29 (discussing the split among circuit courts as to whether this issue is one of law (as determined by the Fifth, Tenth, and D.C. Circuits) or one of mixed law and fact (as determined by the Third, Seventh, Eighth, and Ninth Circuits)). Here, the issue of whether plaintiff spoke as a citizen or a public employee is a matter of law for the Court in this case because no factual disputes exist regarding the underlying content of Frisenda's speech, his job responsibilities, or the other factors relevant to the question of whether he spoke as a citizen or an employee.

no indication that plaintiff circulated this Memorandum outside the MPD, or spoke to anyone outside the MPD about the communications issues raised in the Memorandum. *See, e.g., Healy v. City of New York Dep't of Sanitation,* 286 Fed.Appx. 744, 746 (2d Cir.2008) (affirming summary judgment for defendant and holding that report of corruption was made within scope of official duties where, *inter alia,* the plaintiff uncovered the corruption while performing an assigned task and there was no evidence of external communications).

Third, it is undisputed that the issues raised in the Memorandum were things that he came to learn as part of his duties and responsibilities in the MPD. *See Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 694 (5th Cir.2007). Specifically, the Memorandum describes in great detail things that plaintiff observed, including specific incidents, during the course of his duties that he believed demonstrated a failure to communicate among MPD officers. In fact, plaintiff conceded this fact in his opposition by noting, "[t]o be sure, the December Memo did contain descriptions of actions taken by Plaintiff that were within the scope of Plaintiff's duties and that he probably would not have learned otherwise." (Pl.'s Opp. at 11.)

Again, the Court recognizes that none of the aforementioned factors, including the motivation by the plaintiff in engaging in the speech, is dispositive. *See, e.g., Caraccilo,* 582 F.Supp.2d at 412 ("[T]he fact that plaintiff's speech to these officials may have *related* in some way to her job is not dispositive of whether it was made *pursuant* to her job duties or that it was unprotected[.]" (emphasis in original)); *Davis,* 518 F.3d at 313 n. 3 ("We recognize that it is not dispositive that a public employee's statements are made internally."). However, taken together, all of these undisputed facts paint a clear picture of an employ-

ee speaking out about his views regarding how best to perform his job duties, rather than of someone attempting to make a "contribution[ ] to the civic discourse." *Garcetti,* 547 U.S. at 422, 126 S.Ct. 1951. Far from resembling anything close to "activity engaged in by citizens who do not work for the government[,]" *id.* at 423, 126 S.Ct. 1951, plaintiff's speech was rather "a means to fulfill his employment requirements." *Renken v. Gregory,* 541 F.3d 769, 774 (7th Cir.2008). Accordingly, under the particular circumstances of this case, the speech is not properly subject to the protections of the First Amendment. *Cf., e.g., Caraccilo,* 582 F.Supp.2d at 411 (finding that speech was made as a public employee where the speech was directed at other members of the local government and concerned matters relating to the plaintiff's job duties, and distinguishing that speech from an affidavit that plaintiff signed "in connection with a citizen's Article 78 proceeding," which was found to be speech made as a citizen).

■ The Court finds plaintiff's arguments in response to these undisputed facts to be unpersuasive. For example, plaintiff argues that sending a memorandum of this type to the Chief of Police and Village Board are not within the scope of his job duties, and the recipients are not required to respond to such memorandum. As a threshold matter, the Court notes that it is undisputed that it is part of his job duties to take corrective or disciplinary action towards subordinates who commit improper conduct, which was the subject of the Memorandum. (Defs.' 56.1 ¶ 162.) In any event, the critical issue is not whether the Memorandum was required as part of his formal job description. In other words, even if the statements were not an explicit requirement of plaintiff's job, such would not automatically render the speech protected. As the Second Circuit

concluded in *Weintraub v. Board of Education of the City of New York*, 593 F.3d 196, 203 (2d Cir.2010), and joining other circuits who had reached the same conclusion, "under the First Amendment, speech can be 'pursuant to' a public employee's official duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." Thus, in *Weintraub*, the Court held that the plaintiff's "grievance was 'pursuant to' his official duties because it was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties.'" *Id.* (quoting *Williams*, 480 F.3d at 694); *see also Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 349 (6th Cir.2010) ("It is clear—without any intricate parsing of [plaintiff's] job description—that her complaint about class size owes its existence to her responsibilities as a special education teacher." (quotation marks omitted)); *see also Hickey v. Myers*, No. 09–CV–307, 2010 WL 786459, at *7 (N.D.N.Y. Mar. 2, 2010) (plaintiff's speech as Dean was not protected under First Amendment because his "complaints about the fraudulent admission policies directly affected Plaintiff's ability to properly execute his job as Dean").

Here, plaintiff was a Lieutenant, which is the highest ranking MPD officer below the Chief, and thus was reporting to the next person in his direct chain-of-command a matter that he had observed during his employment and that related directly to the performance of lower-ranking MPD police officers. There is absolutely no question that this communication was prompted by his concerns about his ability, and the ability of other officers, to properly execute their duties as police officers. Thus, this type of communication falls squarely within the scope of speech as a public employee under *Garcetti*.

Moreover, the fact that plaintiff also copied the Memorandum to next level of supervision (*i.e.*, the Village Board) does not alter the analysis in this case. The fact that plaintiff not only expressed the grievance to his immediate supervisor, but also to the entity ultimately responsible for the proper functioning of the police department is simply further evidence that this speech was not citizen speech; rather, the Memorandum—whether required or not—was clearly pursuant to his duties as a police officer. *See, e.g., White v. Sch. Bd. of Hillsborough Cnty.*, No. 8:06–CV–1626–T27MAP, 2008 WL 227990, at *5 (M.D.Fla. Jan. 25, 2008) (holding that letter that was copied to the school's Board of Directors was written pursuant to her duties and was not protected speech); *see also Knight v. Drye*, 375 Fed.Appx. 280, 282 (3d Cir. 2010) (police officer's "complaint up the chain of command to [another officer] and [the Police Chief] is not speech protected by the First Amendment"); *Conard v. Pa. State Police*, 360 Fed.Appx. 337, 339–40 (3d Cir.2010) (the fact that plaintiff broke the chain of command to report misconduct to a higher level supervisor, and the fact that it was outside her job description, did not alter conclusion that the statements were made as a public employee during course of her official duties); *Winder v. Erste*, 566 F.3d 209, 215 (D.C.Cir. 2009) ("In our cases applying *Garcetti*, we have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command."); *Akins v. Fulton Cnty., Ga.*, 278 Fed.Appx. 964, 971 (11th Cir. 2008) ("That the plaintiffs had no affirmative duty to go outside the formal chain of command and directly report these bid irregularities to [the Commissioner], or any other commissioner, does not convert their speech to that of a private citizen.");

*Fulmer v. Pennsylvania,* No. 2:08cv1630, 2011 WL 915846, at *9 (W.D.Pa. Mar. 16, 2011) ("Plaintiff [police officer's] speech was made to superiors who are charged with the duty of investigating internal complaints and regulating employee conduct. It was disseminated to those whose job it was to gather such information and pass it up the chain-of-command. As such, the speech was given in a setting designed to uncover the truth about the conduct of fellow officers and provide appropriate official response or discipline. Speech given to such individuals in such a setting is not designed to disseminate the information to the public."). Thus, plaintiff's argument that the Memorandum was not written within the scope of plaintiff's duties as a Lieutenant is simply without merit.

■ Plaintiff's argument regarding where he wrote the letter is similarly unavailing. The fact that the plaintiff claims to have written the Memorandum at his home does not, by itself, magically transform speech as an employee into speech as a private citizen. In other words, when all of the other undisputed facts point to the speech as a public employee, the location where the internal Memorandum was written does not alter the fundamental nature of the speech, which was made in connection with, and during the course of, plaintiff's job duties.

In sum, given the undisputed facts—including, among other things, that (1) all of the actions described in the Memorandum occurred in the workplace; (2) plaintiff learned of the actions during the course of his job performance; (3) the actions related to the subject matter of plaintiff's job and the ability of MPD officers to effectively execute their jobs; and (4) the Memorandum was an internal Memorandum up to the chain-of-command to the Chief and the Village Board-the Memorandum was made pursuant to plaintiff's official duties and, under *Garcetti,*

cannot give rise to a First Amendment retaliation claim.

### b. Plaintiff's Membership and Participation in the PBA

■ In addition to asserting that his December 30 Memorandum was protected speech, plaintiff asserts that his membership and participation in the Malverne Police Benevolent Association is protected activity under the First Amendment. As set forth below, the Court agrees with plaintiff that such conduct, as a matter of law, constitutes protected activity for purposes of a First Amendment retaliation.

■ The Second Circuit has held that "[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment." *Clue v. Johnson,* 179 F.3d 57, 60 (2d Cir. 1999). Therefore, an employee's association with a union, as well as any speech that arises from his or her position in a union, is constitutionally protected under the First Amendment. *See, e.g., Heffernan v. Straub,* 612 F.Supp.2d 313, 328 (S.D.N.Y.2009); *Donovan v. Inc. Vill. of Malverne,* 547 F.Supp.2d 210, 218 (E.D.N.Y.2008).

In the instant case, plaintiff has put forth evidence that he was an active member of the PBA over the course of his employment at the MPD including, among other things, joining in its campaign activities in 2005. More specifically, plaintiff has asserted that defendants were upset with his union-related activities in or about November 2007, including his participation in a CBA negotiating meeting with the Village after being appointed to the PBA Contract Committee, and the fact that he withdrew his support for the creation of the SOA and voted against it because he believed it was supported by the Village to weaken the ranks of the PBA. If such evidence is credited, the Court concludes that such union activities and union speech

by plaintiff would satisfy the first element of a *prima facie* case for a First Amendment retaliation claim—namely, the "protected speech" requirement. Thus, any attempt by defendants to obtain summary judgment on this ground as to this alleged activity/speech is denied.

### c. Plaintiff's Involvement in the John Donovan Lawsuit

■■■ Finally, plaintiff also argues that his involvement in the John Donovan lawsuit constitutes protected speech for purposes of a First Amendment retaliation claim. As set forth below, the Court agrees.

The Second Circuit has held that "[v]oluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment." *Kaluczky v. City of White Plains,* 57 F.3d 202, 210 (2d Cir.1995); *see also Benedict v. Town of Newburgh,* 95 F.Supp.2d 136, 143 (S.D.N.Y.2000) (holding that "testifying truthfully is constitutionally protected from retaliation, and that it is a right existing wholly apart from the First Amendment protection of speech generally, and without the need to show that the testimony relates to a matter of public concern").

In the instant case, plaintiff has offered evidence that he participated in the Donovan litigation by providing deposition testimony in 2006, and testifying at trial on March 7, 2008. His activities as a witness in that lawsuit are subject to constitutional protection and, thus, any attempt to dismiss that portion of the claim as unprotected speech is denied.

### 2. Adverse Employment Action

■■■ "In the context of a First Amendment retaliation claim ... retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217,

225 (2d Cir.2006) (quotation marks omitted). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). However, "lesser actions may also be considered adverse employment actions." *Id.; see also Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citing *Bernheim v. Litt,* 79 F.3d 318, 324–25 (2d Cir.1996))).

■■■ Plaintiff has put forth sufficient evidence of an adverse employment action—in the form of both threatened disciplinary charges and an actual disciplinary charge—to survive summary judgment. As the Second Circuit has explained, "the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision." *Skehan,* 465 F.3d at 106 (citing *Burkybile v. Bd. of Educ.,* 411 F.3d 306, 313–14 (2d Cir.2005)); *see also Washington v. Cnty. of Rockland,* 373 F.3d 310, 320 (2d Cir.2004) ("Here, the threat of administrative disciplinary proceedings, and the concomitant thirty-day suspension without pay, ... could have a deterrent effect on other officers who wished to protest the Department's allegedly discriminatory practices and policies."). In the instant case, plaintiff has put forth evidence that he was charged with donating blood while on duty, and threatened with over thirty charges and specifications after his protected speech. With respect to the disciplinary charge to which he pled guilty (related to donating blood while on duty), plaintiff forfeited ten vacation days. If these threatened and actual charges are proven to be retaliatory, a rational jury could certainly conclude that such actions

by an employer "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[,] constitut[ing] an adverse action." *Zelnik*, 464 F.3d at 225. Thus, the Court concludes that plaintiff has submitted evidence to create a material issue of fact on the issue of whether he was subject to an adverse employment action.[13]

Therefore, summary judgment on the grounds of a lack of adverse action is denied.

### 3. Causal Connection

Defendants argue that plaintiff has not put forth sufficient evidence of causation to establish that his protected speech was a substantial or motivating factor in any adverse employment action and, thus, any retaliation claim cannot survive summary judgment. As set forth below, the Court disagrees and concludes that, with respect to his union activity and participation in the Donovan lawsuit, that plaintiff has offered sufficient evidence to create a genuine issue of fact on the issue of causation which precludes summary judgment.

 As part of plaintiff's *prima facie* First Amendment retaliation claim, plaintiff must demonstrate a " 'causal connection ... sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.' " *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir.2006) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994)). This causal connection can be demonstrated by plaintiff "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.' " *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir.2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999)). Furthermore, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.' " *Cobb*, 363 F.3d at 108 (quoting *Morris*, 196 F.3d at 111) (alteration omitted). "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris*, 196 F.3d at 110.

 It is well settled that proof of causation may be shown indirectly by, *inter alia*, demonstrating that the protected activity was followed closely by a retaliatory action. *Cifra v. Gen. Elec. Co.*, 252

---

**13.** Plaintiff also asserts that he, in addition to the threats of discipline and the disciplinary charge itself, also was subject to a constructive discharge. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (quotation marks omitted). The Second Circuit has further held that "[t]o find that an employee's resignation amounted to a constructive discharge, 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Id.* (citation omitted). This issue was not briefed by the parties prior to oral argument; rather, following oral argument, defendant submitted a one-page letter on this issue, to which plaintiff responded. However, the Court need not address this issue at this juncture because, as noted above, the Court concludes that a rational jury could find, if all of plaintiff's evidence is credited and all reasonable inferences are drawn in his favor, that the threat of disciplinary charges and the one charge that was filed, constitute an adverse employment action for purposes of a retaliation claim (independent of any constructive discharge). The Court will have the parties, prior to trial, fully brief whether plaintiff, as a matter of law, also can seek to recover for constructive discharge given the record in this case.

F.3d 205, 217 (2d Cir.2001) ("The causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir.1988)))); *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir.2000). Of course, the Court recognizes that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir.2001). However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'.... [Alleged retaliatory a]ction taken (as here) 20 months later suggests, by itself, no causality at all." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citations omitted). Thus, courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation. *See, e.g., Ruhling v. Tribune Co.*, No. 04 Civ. 2430(ARL), 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) (finding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Cunningham v. Consolidated Edison, Inc.*, No. 03–CV–3522 (CPS), 2006 WL 842914 at *19 (E.D.N.Y. Mar. 28, 2006) ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line."); *Hussein v. Hotel Employees & Rest. Union, Local 6*, 108 F.Supp.2d 360, 367 (S.D.N.Y.2000) (finding that the passage of more than two months defeats any retaliatory nexus); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F.Supp.2d 414, 436 (S.D.N.Y.1998) (finding that a "two-and-a-half month" interval "is hardly the close proximity of time ... for allowing a plaintiff to establish the 'causal connection' element" (citation omitted)); *see also Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir.1990) (three and a half months insufficient); *Yarde v. Good Samaritan Hosp.*, 360 F.Supp.2d 552, 562 (S.D.N.Y.2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y.2003) ("A period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related."); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y.1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.").

However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir.1980) (holding more than eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446–47 (2d Cir.1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct.

2405, 165 L.Ed.2d 345 (2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit approximately one year earlier). Thus, the court should consider a time lapse on a case-by-case basis in light of the entire record, which the Court has done here.

In response to defendant's motion for summary judgment, plaintiff points to several categories of evidence that he asserts raises triable issues of fact on causation that are sufficient to defeat summary judgment. As an initial matter, plaintiff has set forth evidence to establish a close temporal proximity between his First Amendment activity and the alleged adverse actions. In particular, there is evidence that plaintiff engaged in First Amendment activity in November 2007—namely, plaintiff's opposition to, and vote against, the SOA which he believed was supported by the Village to weaken the PBA, and his participation in a CBA negotiating meeting with the Village after being appointed to the PBA contract committee—and, about two weeks later, defendants launched their investigation into the use of "Special Days," which resulted in charges only being filed against plaintiff. In addition, there is evidence that, on March 7, 2008, plaintiff engaged in additional First Amendment activity—that is, testifying at the *Donovan* trial (involving an officer claiming retaliation by the Village of Mal-

verne)—and, within two weeks, plaintiff was ordered to report for additional questioning into his blood donations and other departmental matters.[14] Finally, on the issue of temporal proximity, plaintiff points to the testimony of defendant Hennessy that termination is not immediately available to the Village as an option; rather, the Village must "build a case" against the MPD member in order to terminate a member's employment. (Pl.'s 56.1 ¶ 21.) The Court concludes that this evidence of temporal proximity is sufficient, if credited and all reasonable inferences are drawn in plaintiff's favor, to support an inference of retaliation. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir.2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and the adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment."). In addition to the temporal proximity, as discussed below, plaintiff has put forth other circumstantial evidence to support a causal connection between protected activity and the adverse actions by the defendants.

First, plaintiff points to statements by certain individuals which one could reasonably infer suggested a retaliatory motive. For example, plaintiff submits evidence

---

**14.** According to plaintiff, the time line was as follows: "[A]fter testifying in the *Donovan* trial on March 7, 2008, and after the jury rendered a verdict in favor of the Village on March 11, the Defendants held a meeting, on March 13, 2008, to discuss disciplinary actions to be taken against me. I was then ordered to appear for questioning on March 14, 2008, and was harassed by Mr. Frankie and Chief Aresta who continued to ask questions about various days when I donated blood, why those days did not appear in my memo book, and generally questioning the veracity of my whereabouts on those particu-

lar days." (Frisenda Decl. ¶ 31.) Although defendants argue that the starting point for purposes of the temporal proximity analysis should not be plaintiff's trial testimony but rather the date he became involved as a potential witness in the *Donovan* case (which was approximately two years earlier), the Court concludes that, construing the evidence most favorably to plaintiff, a rational jury could conclude that his actual testimony at the trial was a sufficient escalation of his involvement in the case to create an independent motive for retaliation (notwithstanding his prior involvement in the lawsuit).

that former Chief Jacobsen told PBA President and Police Officer John Cantanno that a Village Trustee had told him that, if the PBA members did not pressure John Donovan to drop his lawsuit, the PBA would "have a blood bath on [its] hands."[15] (Cantanno Aff. at ¶ 14.) In addition, according to plaintiff's sworn statement, when plaintiff expressed concerns about participating in the *Donovan* lawsuit and its impact on his ability to be promoted, defendant Aresta responded, "[t]hat's your choice," which plaintiff understood as a threat of retaliation. (Pl.'s 56.1 ¶ 180.)

Second, plaintiff has set forth evidence that he was treated differently with respect to other similarly situated MPD officers in connection with investigation of the "Special Days" and "Blood Days." Specifically, plaintiff states that, when he presented evidence that defendant Aresta had knowledge of the use of Special Days, the defendants continued to focus on plaintiff and Police Officer Cantanno. Moreover, there is evidence that plaintiff was the only member told to produce his memo book as part of the investigation, and was one of the few MPD members to be placed under oath during the interview. In addition, plaintiff points out that Chief Aresta was not interviewed as part of the investigation even though he is the highest ranking member of the MPD, and was the only MPD member to put in for a cash payment for work on a designated Special Day, which is contrary to the CBA. (Tilton Decl., Exs. F & P.)

Third, plaintiff has offered evidence that the conduct which led to the disciplinary charges against him—namely, leaving of the Village of Malverne to donate of blood while on duty—is consistent with the policies and practices of the MPD.[16] For example, plaintiff points to testimony by the Village Attorney, James Frankie, that to his knowledge there are no regulations that require members of the MPD to stay within the Village during lunch breaks. (Pl.'s 56.1 ¶ 130.) In addition, plaintiff stated that, during the time he has been employed by the MPD since 1981, it has been the regular practice for members of the MPD to leave the Village of Malverne, while on duty, in police vehicles during their break. (Frisenda Decl. ¶ 28; Tilton Decl., Ex. G at 28.) Moreover, police officer Robert Malverne testified that, if a member of the MPD was on a break, then he or she was permitted to leave the confines of the Village in order to donate blood. (Tilton Decl., Ex. G at 28.) Furthermore, Police Officer JoAnne McNelis stated during her interview that she donated blood while on duty when she attended the Nassau County Police Department, and became aware of "Blood Days" while a recruit at the police academy. (Latham Decl. ¶ 13.) Plaintiff also notes that, the Village Board, either by statute or in the CBA, did not expressly prohibit officers from donating blood while on duty. (Tilton Decl., Ex. Q.)

Finally, plaintiff has pointed to evidence that another officer left duty early to donate blood but, unlike plaintiff, that officer

---

**15.** Cantanno also explained in detail in that affidavit the basis for his belief that the reason given for denying Donovan the promotion to Sergeant was pretext for retaliation. (*See* Cantanno Aff. at ¶ 15 ("It is my firm belief, based upon my personal experience within the Village of Malverne, that John Donovan has not been promoted to Sergeant because of his previous PBA Board membership, and because of his PBA activities, which include political support rendered on behalf of a PBA-endorsed candidate for Village Trustee named Andrew Chernoff.")).

**16.** At oral argument, plaintiff suggested that his blood donation occurred during his break. However, it is unclear where in the record that fact is contained. In any event, whether plaintiff was on break or not is not dispositive of the motion.

was not subject to disciplinary charges for his conduct. In particular, there was evidence that Sergeant Kid left work early to donate blood. There is no evidence that Sergeant Kid was investigated or subject to any disciplinary charges; rather, he was promoted to Lieutenant less than one month after plaintiff left the MPD. (Latham Decl. ¶ 19; Titlon Decl., Ex. AB.) At oral argument, defendants' counsel argued that Sergeant Kid was not similarly situated to plaintiff because (1) Sergeant Kid did not give blood on his shift, but rather left his shift early (at 5:00 p.m., rather than completing his shift until 7:00 p.m.) to give blood; and (2) a sergeant is not as high-ranking as a lieutenant, who should be setting an example for all officers. However, the significance of either of those distinctions is debatable. For example, one could argue that leaving work early to donate blood (as Sergeant Kid did), if it was without a replacement, places the MPD and the public at greater risk than plaintiff donating blood in a neighboring town about three miles away. Similarly, although plaintiff was a higher rank than Sergeant Kid, an argument can be made that a higher ranking officer such as plaintiff was still able to perform his supervisory tasks while donating blood (through radio communication), while Sergeant Kid could perform no such tasks if he simply left work early to donate blood.[17] The Court concludes, under the circumstances of this case, that the question of whether plaintiff was similarly situated to Sergeant Kid, in all material respects, cannot be resolved on summary judgment.[18] *See, e.g., Graham v. Long Island R.R.*, 230

F.3d 34, 39 (2d Cir.2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."); *see also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir.2001) (same); *see McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir.2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."); *accord Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997).

In sum, although defendant has proffered arguments and evidence to rebut plaintiff's evidence of retaliation, the Court must accept plaintiff's version of events and draw all reasonable inferences in favor of plaintiff at the summary judgment stage. Accordingly, under that standard, the Court concludes that there is sufficient evidence to raise a genuine issue of material fact concerning whether defendants' reason for the adverse actions were a pretext for retaliation based upon protected speech. Accordingly, summary judgment on this ground is denied.

### 4. Rebuttal of Prima Facie Case

Defendants further argue that "[e]ven if the court were to find that plaintiff established a *prima facie* case of retaliation, plaintiff would still be unable to succeed, as the record reflects that the Village would have taken the same action in the absence of the protected conduct." (Defs.' Mem. of Law at 13.) As set forth below, the Court concludes that, given the disputed issues of fact in this case, this question cannot be decided on summary judgment.

█ It is well settled that "even if there is evidence that the adverse employ-

---

**17.** Plaintiff testified that his duties were primarily administrative in nature, and typically required him to stay in the station house, at a desk, receiving incoming calls and dispatching cars. (Frisenda Dep. at 23–24.)

**18.** There was also evidence that one or two other officers, besides plaintiff, had donated

blood while on duty. However, the uncontroverted evidence is that those incidents had occurred several years prior to the investigation and any disciplinary charges would have been untimely. (Frankie Dep. at 23.) Thus, these individuals are not similarly situated to plaintiff.

ment action was motivated by protected speech, the government can avoid liability if it can show that it would have take the same adverse action in the absence of the protected speech." *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir.1998). As this Second Circuit has explained, "[t]his principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct." *Id.* Thus, the Second Circuit has held that "[c]onduct that is properly initiated, reasonably executed, independently justified and equally administered—regardless of any animosity towards the plaintiff—does not give rise to a constitutional claim for retaliatory harassment." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 109 (2d Cir.2000).

Defendants argue that "the record shows that plaintiff improperly took time as Blood Days and admitted that he left the Village, while on duty and in a MPD vehicle, to give blood in another municipality" and, thus, "potentially put other officers as well as members of the public at risk in the event of an emergency." (Defs.' Mem. at 14.) (citations omitted). Defendants contend that, given this misconduct, they would have initiated disciplinary charges against plaintiff regardless of any of his alleged protected activities. (*Id.*) Defendants further assert that the investigation into plaintiff's conduct was conducted in a reasonable and even-handed manner. (*Id.* at 15.)

Having carefully reviewed the record, the Court concludes that there are genuine issues of material fact, which have been discussed *supra* on the issue of causation (and which the Court will not repeat here), that also preclude summary judgment on the issue of whether defendants would have disciplined plaintiff even if they were motivated to discipline him because of his speech in connection with his union activities and/or his testimony at the *Donovan* trial. For example, as noted *supra*, there was evidence that Sergeant Kid left work early one day to donate blood and was not disciplined, but rather was subsequently promoted. The question of whether plaintiff was similarly situated to Sergeant Kid is sufficiently close (and the facts surrounding it in dispute) that it cannot be decided on summary judgment.

Plaintiff also puts forth other evidence to support his position that he would not have been disciplined but for his protected speech, including: (1) prior to March 2008, he had a 27–year career in the MPD that was free from any reprimands or discipline (Frisenda Decl. ¶ 3); (2) even though blood could only be donated every 56 days under the applicable policy, other officers were credited with two Blood Days within a 56–day period and were not investigated (*id.* at ¶¶ 32–33); and (3) it was a common practice to allow officers to engage in certain activities while on duty (outside Malverne), even though it could affect their ability to respond to emergencies (*id.* at ¶¶ 26–29).[19]

---

**19.** Plaintiff gave several examples, including the following: (1) "During my employment with the MPD, it was common practice to allow members of the department to work out at Gold's Gym in Lynbrook, while on duty. Members could choose to take their meal periods at the gym and exercise. For example, I would often run several miles while working, during these meal periods. In fact, former Chief Garrigan encouraged such behavior, and Chief Aresta never forbade this practice when he became Chief of Police[,]"

(Frisenda Decl. ¶ 28); and (2) "For eight years, members of the MPD also participated in events like 'The Law Enforcement Torch Run' while on duty. That event started on Sunrise Highway in Rosedale and ended at SUNY Farmingdale, with opposite years starting at SUNY Farmingdale and ending up at Nassau Community College. One year, former Chief Jacobsen participated in the event by driving one of the escort vehicles." (*Id.* at ¶ 29.)

In sum, accepting plaintiff's evidence as true and drawing all reasonable inferences in favor of plaintiff, the Court concludes that the record contains genuine issues of material fact that defeat defendants' motion for summary judgment on the issue of whether defendants would have disciplined plaintiff even if they were motivated to discipline him because of his speech in connection with his union activities and/or his testimony at the Donovan trial. *See, e.g., Heffernan v. Straub,* 612 F.Supp.2d 313, 329–30 (S.D.N.Y.2009) ("We do not hold that, but for plaintiff's Union activity, defendants would not have preferred disciplinary charges against him; indeed they may well have. Rather, we hold that defendant have not met their burden for grant of summary judgment on that basis.").

### B. The Equal Protection Claim

Defendants argue, *inter alia,* that plaintiff's Section 1983 claim under the Equal Protection Clause cannot survive summary judgment because "class of one" claims are not actionable as a matter of law in lawsuits involving public employment. As set forth below, the Court agrees.

▆▆▆ The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Cent., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, plaintiff does not allege that he is part of a protected class and, thus, appears to be bringing his claim pursuant to the Equal Protection Clause under the "class of one" theory. In *Prestopnik v. Whelan,* the Second Circuit explained the difference between "class of one" equal protection claims and more traditional equal protection claims:

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494,

499 (2d Cir.2001). While this clause "is most commonly used to bring claims alleging discrimination based on membership in a protected class," it may also be used to bring a "class of one" equal protection claim. *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005); *see also Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). In a "class of one" case, the plaintiff uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff . . . to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson,* 409 F.3d at 105.

249 Fed.Appx. 210, 212–13 (2d Cir.2007); *see also King v. N.Y. State Div. of Parole,* 260 Fed.Appx. 375, 379 (2d Cir.2008) ("In *[Olech],* the Supreme Court recognized the viability of an Equal Protection claim 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" (quoting *Olech,* 528 U.S. at 564, 120 S.Ct. 1073)).

▆▆▆ As defendants correctly argue, to the extent that plaintiff is attempting to assert a "class of one" claim under the Equal Protection Clause, that claim cannot survive summary judgment in the wake of *Engquist v. Oregon Department of Agriculture,* 553 U.S. 591, 605–07, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008), in which the Supreme Court held that no "class of one" claims can be asserted in the public employer context. *See also Appel v. Spiridon,* 531 F.3d 138, 141 (2d Cir.2008) ("Recently, the Supreme Court held that the Equal Protection Clause does not apply to a public employee asserting a violation of

the Clause under a 'class of one' theory."); *Stimeling v. Bd. of Educ.*, No. 07–1330, 2008 WL 2876528, at *4 (C.D.Ill. July 24, 2008) ("In light of *Engquist*, the Court sees no possibility that Plaintiff can state a class-of-one retaliation claim based on the equal protection clause.").

■ Similarly, to the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity (rather than under a class-of-one theory), such a claim is completely duplicative of the First Amendment retaliation claim and, therefore, should not go forward. *See Grossbaum v. Indianapolis–Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n. 8 (7th Cir. 1996) ("We do not, imply, however, that retaliation claims arise under the Equal Protection Clause. That clause does not establish a general right to be free from retaliation."); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir.1988) ("[Plaintiff] claims only that he was treated differently than other uncertified teachers in retaliation for the exercise of his First Amendment rights.... Such a claim fits uneasily into an equal protection framework. Normally, we think of the Equal Protection Clause as forbidding the making of invidious classifications—classifications on the basis of such characteristics as race, religion, or gender. Here, plaintiff is not claiming that he was classified on the basis of some forbidden characteristic, only that he was treated differently because he exercised his right to free speech. We believe this is best characterized as a mere rewording of plaintiff's First Amendment-retaliation claim, which was properly disposed of."); *Schmidt v. Lincoln Cnty.*, 249 F.Supp.2d 1124, 1137 (W.D.Wis.2003) (granting summary judgment on equal protection claim because "plaintiff's equal protection claim is merely duplicative of his First Amendment retaliation claim"); *see also Petrario v. Cutler*, 187 F.Supp.2d 26, 35 (D.Conn.2002) ("The Second Circuit

has not recognized a right under the Equal Protection Clause to be free from retaliation based on union activity.").

Accordingly, defendants' motion for summary judgment on the plaintiff's equal protection claim is granted.

### C. Municipal Liability

■ The Village argues that no municipal liability exists against the Village of Malverne on the following grounds: (1) if none of plaintiff's claims against the individual defendants can survive summary judgment, then no municipal liability can exist; and (2) plaintiff has offered no evidence of any Village custom, policy, or practice that could form the basis of municipal liability against the Village. With respect to the first ground, given that the Court has determined that summary judgment is unwarranted as to the individual defendants on the Section 1983 claim for First Amendment retaliation, that argument is moot and cannot be a basis for summary judgment in favor of the Village. With respect to the second argument, municipal liability can be established by a plaintiff, *inter alia*, (1) by demonstrating an official policy or custom of the municipality, or (2) by showing that a municipal "policymaker" violated plaintiff's constitutional rights. As discussed below, although the Village argues that there is a lack of sufficient evidence of an official policy or custom in this case, no argument whatsoever has been made by the Village as to why municipal liability cannot be based in this case on the alleged unconstitutional actions of Village policymakers— namely, the Chief of Police and the Village Board. Thus, summary judgment can be denied on that basis alone.

### 1. Legal Standard

#### a. Evidence of Municipal Custom or Policy

■ The Supreme Court expressly rejected liability pursuant to a theory of

*respondeat superior* for purposes of Section 1983 in *Monell.* *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on *a respondeat superior* theory." (emphasis in original)). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." *Abreu v. City of New York*, No. 04-CV-1721 (JBW), 2006 WL 401651, at *4, 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quotation marks omitted) (citing *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). However, "the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.1995) (quotation marks omitted). The plaintiff in a Section 1983 action bears the burden of establishing municipal liability. *See Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).

### b. Policymakers

 In addition to demonstrating directly that a municipality has a custom or policy that led to a constitutional violation, the Second Circuit has held that a plaintiff may demonstrate municipal liability by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's] authorized policymakers.

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir.2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir.2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F.Supp.2d 463, 478 (E.D.N.Y.2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. .... "). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296; *see also Amnesty Am.*, 361 F.3d at 126 ("Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (citation omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986))). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law.... The relevant legal materials[ ] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000), *cert. denied*, 531 U.S. 813, 121

S.Ct. 47, 148 L.Ed.2d 16 (2000) (quotation marks and citations omitted). Specifically, "'[t]he matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury.'" *Richardson v. Metro. Dist. Comm'n,* No. 3–00–CV–1062 (JCH), 2003 WL 21727781, at *6, 2003 U.S. Dist. LEXIS 12757, at *20 (D.Conn. July 23, 2003) (quoting *Jeffes,* 208 F.3d at 57).

In particular, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski,* 424 F.3d at 296 (quoting *Rookard v. Health and Hosps. Corp,* 710 F.2d 41, 45 (2d Cir.1983)); *see also Diodati v. City of Little Falls,* No. 6:04–CV–446 (FJS/DEP), 2007 WL 189130, at *2, 2007 U.S. Dist. LEXIS 4322, at *6 (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'" (quoting *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir. 2003))). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes,* 208 F.3d at 57 (quotation marks omitted) (emphasis in original). "Thus, the court must ask whether [the] governmental official [is a] final policymaker[ ] for the local government in a particular area, or on [the] particular issue involved in the action." *Jeffes,* 208 F.3d at 57 (quotation marks omitted); *see also Doe v. City of Waterbury,* 453 F.Supp.2d 537, 543 (D.Conn.2006) ("The critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." (emphasis in origi-

nal)). However, "[a]lthough the official in question does not have to be a final policymaker for all purposes, but only with respect to the conduct challenged, simply exercising discretion in an area where that official is not the final policymaker under state law cannot, by itself, establish municipal liability." *Barry v. N.Y. City Police Dep't,* No. 01 Civ. 10627(CBM), 2004 WL 758299, at *4, 2004 U.S. Dist. LEXIS 5951, at *43 (S.D.N.Y. Apr. 6, 2004); *see also Diodati,* 2007 WL 189130, at *2, 2007 U.S. Dist. LEXIS 4322, at *6 ("An individual who merely has discretion to handle a particular situation is not a policymaker."); *Richardson,* 2003 WL 21727781, at *6, 2003 U.S. Dist. LEXIS 12757, at *20 ("Mere discretion in the performance of his duties is not sufficient. However, the official need only have the power to make official policy on a particular issue."). On the other hand, where a policymaker "exceeded the bounds of the authority granted to him," his actions "cannot be fairly said to represent official policy." *City of Waterbury,* 453 F.Supp.2d at 544 ("[A]lthough Giordano is generally a final policymaker for Waterbury, Giordano's specific actions in this case cannot be fairly said to represent official policy, because under state law, he exceeded the bounds of the authority granted to him.")

### 2. Application

In the complaint, plaintiff asserts a claim of municipal liability against the Village based upon, among other things, the allegation that "the individual policymakers directly participated in ... the discrimination/retaliation to which Plaintiff was subjected." (Compl. ¶ 85.) In its motion for summary judgment, the Village did not address this issue of municipal liability based on the alleged actions of a policymaker in its cursory two-page analysis of the *Monell* claim, but rather only focused on the "custom or practice" issue.

In fact, plaintiff set forth his case authority and evidence on the policymaker issue in his opposition to the motion for summary judgment. (*See* Pl.'s Opp. at 23–24 (citing Second Circuit authority and arguing "the actions taken against Plaintiff were taken by those with the authority to act on behalf of the Village"); *see id.* at 25 ("[b]ecause the Village had authority over how to chose to terminate members of the MPD ... it should be held liable under *Monell*")). However, the Village did not respond to those arguments and, in fact, did not specifically address the *Monell* liability in its reply (other than to state in a one-sentence footnote that they were relying on their moving papers).

■ Having carefully considered the record, the Court concludes that there is sufficient evidence in the record to defeat summary judgment under the "final policymaker" theory of municipal liability. As discussed in detail *supra*, plaintiff has set forth evidence that the Chief of Police and the Village Board directly participated in the disciplinary investigation and charging decision relating to plaintiff. That evidence is sufficient to defeat summary judgment on the issue of municipal liability with respect to the First Amendment retaliation claim.[20] *See Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003) ("Here, plaintiff challenges as retaliatory employment decisions made by [the defendant], who, as the Suffolk County police commissioner, had authority to set department-wide personnel policies. [The defendant's] position provides a sufficient basis for holding the County liable for his adverse decisions with respect to plaintiff.")

### D. Qualified Immunity

■ The individual defendants also contend that they are entitled to summary judgment on qualified immunity grounds for all of the constitutional violations asserted by plaintiff.[21] For the reasons set forth below, however, the Court denies summary judgment to the individual defendants on this ground.

#### 1. Legal Standard

■ According to the Second Circuit, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell,* 316 F.3d at 385; *see also Fielding v. Tollaksen,* 257 Fed.Appx. 400, 401 (2d Cir.2007) (explaining that government officers "are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law"). "A right is clearly established when the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.... The unlawfulness must be apparent." *Connell v. Signoracci,* 153 F.3d 74, 80 (2d Cir.1998) (quotation marks omitted). In addition, the Second Circuit

---

20. Although plaintiff also argues in the alternative that summary judgment is unwarranted because of the existence of an official policy or custom (based upon alleged retaliation towards former Chief Jacobsen), the Court need not address that issue for purposes of summary judgment because the Court has already determined that summary judgment is unwarranted on the *Monell* claim under the "final policymaker" theory.

21. The issue of qualified immunity does not affect the Village because "[m]unicipalities do not enjoy either absolute or qualified immunity from suit under Section 1983." *White River Amusement Pub, Inc. v. Town of Hartford,* 412 F.Supp.2d 416, 429 n. 6 (D.Vt.2005), *aff'd,* 481 F.3d 163 (2d Cir.2007) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)).

has repeatedly stated that qualified immunity only protects officials performing "discretionary functions." *See Simons v. Fitzgerald,* 287 Fed.Appx. 924, 926 (2d Cir. 2008) (" 'Qualified immunity shields government officials performing discretionary functions from liability for civil damages .... ' " (quoting *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007))); *Piscottano v. Town of Somers,* 396 F.Supp.2d 187, 208 (D.Conn.2005) (" 'The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " (quoting *Lee v. Sandberg,* 136 F.3d 94, 100 (2d Cir.1997))).

As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' " *McClellan v. Smith,* 439 F.3d 137, 147 (2d Cir.2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Accordingly, courts should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

With respect to the summary judgment stage in particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.' " *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (quoting *Williams v. Greifinger,* 97 F.3d 699, 703 (2d Cir.1996)); *see also Oliveira v. Mayer,* 23 F.3d 642, 649 (2d Cir.1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required." (citations and quotation marks omitted)); *Stancuna v. Sherman,* 563 F.Supp.2d 349, 356 (D.Conn.2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical. As noted above, there are issues of material fact in this case that this court may not decide. These issues of fact are critical to determining whether Sherman was operating under a reasonable belief as to what kind of search he was permitted to conduct." (citation and quotation marks omitted)).

2. Application

First, it is axiomatic that the right that plaintiff asserts—namely, his right under the First Amendment to be free from retaliation for his union activities and for testifying in a lawsuit—is clearly established. *See, e.g., Dobosz v. Walsh,* 892 F.2d 1135, 1141 (2d Cir.1989) ("the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established"); *see also Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir. 1997) (county judge not entitled to qualified immunity from retaliation claim because "it is well-established that a public

official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983.").

██ Second, as described above, the Court has found that genuine issues of material fact preclude the Court from determining as a matter of law that this clearly established right was not violated. Thus, the critical question is whether it was objectively reasonable for the individual defendants to believe that they were not committing such violations and, as the Court sets forth below, the Court declines to so conclude as a matter of law that it was objectively reasonable for defendants to believe that they were not violating plaintiff's rights.

Specifically, according to the Second Circuit, the very fact that the Court has determined—as described *supra*—that a rational jury could find, if all of plaintiff's evidence is credited and all reasonable inferences are drawn in his favor, that the individual defendants retaliated against plaintiff for exercising his First Amendment rights, is independently sufficient to preclude the Court from determining as matter of law that the individual defendants' actions were objectively reasonable. In other words, if the individual defendants did in fact intentionally retaliate against plaintiff because of his First Amendment activity, they would not be protected by qualified immunity.

As the Second Circuit explained in *Dobosz v. Walsh*, in finding summary judgment was unwarranted on the issue of qualified immunity in a First Amendment retaliation case:

> [Plaintiff] ... has also alleged a broad campaign (including the suspension) by [the defendant] to retaliate against him for his exercise of his First Amendment speech rights. [Defendant] is not entitled to qualified immunity with respect to this claim. Because [plaintiff] has adequate evidentiary support for his

claim of retaliation to withstand [defendant's] motion for summary judgment, we must assume for purposes of discussion that [defendant] did retaliate against [plaintiff]. The proper inquiry in this context is, assuming [defendant] had such a motive, whether it was clearly established in 1981 that such a campaign of harassment (including the suspension) based on the alleged retaliatory motive would violate [plaintiff's] First Amendment rights. [Plaintiff] clearly was exercising his right to free speech when he cooperated with the F.B.I. and when he testified against his fellow officer in court. Because the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established, we conclude that [defendant] is not entitled to qualified immunity . . . .

892 F.2d at 1141–42 (citations omitted).

Similarly, in *Mandell v. County of Suffolk*, 316 F.3d at 385, the Second Circuit held that, given the district court had concluded that there were disputed issues of fact on the issue of intent that precluded summary judgment on a First Amendment retaliation claim, qualified immunity was also unwarranted. In particular, the Court explained:

> Where the specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity is inappropriate. In the present case retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against [the defendant] cannot be dismissed on qualified immunity grounds.

*Id.* (citations omitted); *see also Skehan,* 465 F.3d at 111 ("[W]e agree with the district court that no reasonable state employee could think that he was allowed to discipline an employee more severely because of the employee's expression of his First Amendment rights.").

Here, for the reasons stated *supra,* the Court has determined that—if plaintiff's version of events is credited—a rational jury could find that individual defendants retaliated against him based upon his First Amendment activity. Under these circumstances, given the disputed facts, the Court declines to conclude as a matter of law that the individual defendants' conduct was objectively reasonable. Accordingly, the Court denies the individual defendants' summary judgment motion on qualified immunity grounds.

### E. State Law Claims

Defendants also move for dismissal of the state law claims on two grounds: (1) because plaintiff failed to assert a viable federal claim, the Court should decline to exercise supplemental jurisdiction over the pendant state law claims; (2) with respect to the claim under N.Y. Civil Service Law ("CSL") § 209-a, it should be dismissed as untimely. As set forth below, the Court concludes that there are no grounds for dismissal of the state law claims.

■ First, since the Court has concluded that certain federal claims survive summary judgment, the Court will exercise supplemental jurisdiction over the state law claims. Moreover, defendants concede that "any possible state constitutional claims share the same standards as the federal claims." (Def.s' Mem. of Law at 24 n. 4). Therefore, to the extent defendants re-assert the same arguments as to the state constitutional claims that they made in connection with the federal claims, such arguments are rejected for the same reasons discussed *supra* with respect to the federal constitutional claims.

■ Second, the Court concludes that the Section 209-a claim is not time-barred. Defendants argue that the four-month statute of limitations under N.Y. C.P.L.R. § 217 is applicable to plaintiff's Section 209-a claim. However, according to the plain language of the provision, Section 217 is only applicable when there is a claim for breach of the duty of fair representation claims by the union. Here, plaintiff has made clear that he is not asserting any such claim, but rather asserts his claim under Section 209-a(1)(c), which deals with discrimination by an employer "for the purpose of encouraging or discouraging membership in, or participation in the activities of, [an] employee organization." CSL § 209-a(1)(c). Given the absence of any claim that falls within the parameters of Section 217 and the absence of any other limitations period for a claim under Section 209-a(1)(c), the six-year statute of limitations should apply. N.Y. C.P.L.R. § 213(1). Given that the relevant conduct at issue took place in or about March 2008 and this lawsuit was filed in September 2008, the Section 209-a(1)(c) claim is timely.

Accordingly, summary judgment on the state law claims is unwarranted.

### V. Conclusion

For the foregoing reasons, the Court (1) denies defendants' motion for summary judgment with respect to plaintiff's First Amendment retaliation claim under Section 1983 against both the individual defendants, as well as against the Village under *Monell;* (2) denies defendants' motion on the state law claims; and (3) grants defendants' motion for summary judgment with respect to plaintiff's Equal Protection Claim.

SO ORDERED.